AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

| LODGED |
| --- |
| CLERK, U.S. DISTRICT COURT |
| 02/02/2021 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: ___DM___ DEPUTY |

# UNITED STATES DISTRICT COURT
for the
Central District of California

| FILED |
| --- |
| CLERK, U.S. DISTRICT COURT |
| 2/2/21 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: ___slo___ DEPUTY |

United States of America

v.

KISOO YOM,
 aka "Ki Yom,"

Defendant(s)

Case No. 2:21-mj-00571

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of January 13, 2021 through February 1, 2021 in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 1951 | Extortion or Attempted Extortion by Nonviolent Threat |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Jeffrey S. Eastman
*Complainant's signature*

Jeffrey S. Eastman, Special Agent HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 2/2/21

John E. McDermott
*Judge's signature*

City and state: Los Angeles, California

Hon. John E. McDermott, U.S. Magistrate Judge
*Printed name and title*

## **AFFIDAVIT**

I, Jeffrey S. Eastman, being duly sworn, declare and state as follows:

### I. **PURPOSE OF AFFIDAVIT**

1. This affidavit is made in support of a criminal complaint and an arrest warrant against KISOO YOM ("YOM"), also known as "Ki Yom," for a violation of 18 U.S.C. § 1951: Extortion or Attempted Extortion by Nonviolent Threat.

2. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II. **BACKGROUND OF AFFIANT**

3. I am a Special Agent with Homeland Security Investigations ("HSI") and have been so employed with HSI and its predecessors since November 2001. Prior to my employment with HSI, I was a Special Agent with the U.S. State Department, Diplomatic Security Service for four years. I have investigated white-collar crimes since 2001. I am currently assigned to HSI El Camino Real Task Force in Los Angeles County, where I am responsible for investigating fraud, financial crimes, and other

violations of law enforced by HSI, including money laundering and intellectual property rights offenses. I have successfully completed U.S. Customs Services ("USCS") Basic Enforcement School at the Federal Law Enforcement Training Center, Glynco, Georgia. In addition, I have participated in advanced training through USCS in financial investigations, asset forfeiture, and smuggling investigations. I have participated in the execution of numerous search warrants and the civil seizure of bank accounts, currency, vehicles, and real properties based on money laundering and structuring offenses.

### III. **SUMMARY OF PROBABLE CAUSE**

4.  In mid-January 2021, HSI received a tip that a healthcare company (the "Company"), located in Los Angeles County, California, was being extorted by its former CFO, YOM. Specifically, YOM sent an email to the Company raising allegations that the Company had committed fraud in receiving approximately $5.7 million in loans from the Paycheck Protection Program ("PPP") through the Small Business Administration.

5.  Following YOM's initial email, HSI learned that YOM made three unrecorded calls to the Company's General Counsel. During the calls, YOM presented the company with two options. Option one, as it was phrased, would require the company to return the $5.7 million in PPP funds to the government and pay YOM additional severance. Option two, as it was phrased, would require the company to pay YOM $500,000 plus twelve months of severance in order for YOM to not contact authorities or file a qui tam suit. In response to YOM's demands, the company

indicated that there was nothing wrong with its PPP loans and repeatedly asked YOM for information to substantiate his allegations. YOM declined to provide additional evidence, stating that "only" he could detect the fraud.

6. At law enforcement's request and with the Company and its General Counsel's consent, the General Counsel recorded additional calls with YOM during late January. In those calls, YOM continued to demand his $500,000 payment, in addition to twelve months of severance, to remain silent. During these calls, YOM stated that if the Company did not accede to his demands, he would take action. YOM even went so far as to say that he was in contact with qui tam attorneys who were "salivating" at the prospect of filing suit against the Company. He also mentioned the prospect of criminal penalties against the Company and others if he went public with his allegations. If the Company agreed to his demands, however, YOM indicated he would remain silent, stating, among other things, "Trust me, if we do this, no one is ever going to hear from me. No one is going to get any information. I am not going to do anything shady like that."

## IV. STATEMENT OF PROBABLE CAUSE

### A. HSI is Alerted to a Potential Extortion Scheme and Receives a Copy of an Email YOM Sent the Company

7. In January 2021, I was notified of a potential extortion scheme against the Company by its recently terminated CFO, YOM. Specifically, I received a copy of an email that YOM sent to the Company's General Counsel on January 13, 2021 with

3

the subject line "Notice to the Company" which included an attached document titled "Notice to Report [the Company]" (the "Notice to Report"). The email was sent from the email address of 1ki.yom@gmail.com.

8. In the Notice to Report, which was dated January 9, 2021 and signed by YOM, YOM alleged that the Company fraudulently obtained a PPP loan from the U.S. Small Business Administration. Specifically, in his letter, YOM stated that "[a]s the CFO and [a] CPA certified under the State of California, I have an obligation to report [the Company] and its senior executives [Officer 1] and [Officer 2] to the Fed in a fraudulent whistle blower claim related to the recent PPP loan that was obtained from the government and CalBank in 2020." YOM went on to state that "I believe that the company has unlawfully extorted millions in funds from the government and has manipulated the calculations used in the application of these funds. In addition, the Company 'gamed' the system to plan to manipulate headcount information used in the PPP . . . ."

9. YOM further wrote that "[i]t is clear that [the Company] did not need PPP funds which total approximately $5,767,015 cumulatively for all [the Company] entities . . . ." YOM further alleged that the Company used PPP funds to finance the repayment of loans and the payout of a qui tam settlement to the government instead of its intended purpose.

10. YOM then stated he was giving the Company the opportunity to return the PPP funds and to voluntarily withdraw the application for forgiveness of the loans. YOM stated that

4

if the Company did not return the PPP funds, that YOM would "have no choice but to contact the Fed, Department of Justice and SBA directly to provide information needed to support these claims and take part in a Qui Tam lawsuit against the company." The Notice to Report provided links on how PPP funds could be returned. YOM gave the Company a deadline of January 22, 2021 to "come clean." YOM said that "[i]f I do not receive evidence that this has been initiated by this date, I will be moving forward with this claim." YOM did not discuss any demand for additional funds for himself in the Notice to Report. The Notice to Report was signed by "Ki Yom, Chief Financial Officer."

### B. The Company Briefs HSI on Three Prior Calls with YOM After His Notice to Report

11. Following my receipt of a copy of YOM's Notice to Report, on January 18, 2021, I received additional information about three calls that YOM made to the Company's General Counsel following his Notice to Report. Specifically, the Company's General Counsel and its outside counsel provided a synopsis of three calls that YOM made to the Company's General Counsel during the week of January 12, 2021. During these calls, YOM ultimately demanded either that the Company return the $5.7 million in PPP funds to the government (which YOM referred to as "option one") or, in the alternative, pay $500,000 directly to YOM to keep him from disclosing his allegations of PPP fraud or

filing a qui tam suit (which YOM referred to as "option two").[1] YOM indicated that if he received this $500,000 payment the Company would be able to keep its PPP funds and he would not disclose what he knew to anyone.

12. The Company and its counsel described the three calls to me as follows:

    a. The first call from YOM to the Company's General Counsel accompanied the delivery of YOM's Notice to Report.

    b. In YOM's second call, the Company's General Counsel attempted to obtain evidence regarding YOM's vague allegations in the Notice to Report. YOM responded, in substance, that only he, as former CFO, knew about the allegations and that no one else would be able to detect the fraud. YOM then summarily dismissed the General Counsel's inquiry into more facts, stating that he (YOM) did not want to discuss the particulars.

    c. In the third call, which occurred on Friday, January 15, 2021, YOM demanded the payment of $500,000 from the Company in exchange for him not contacting the authorities about his allegations that the Company engaged in PPP fraud.

13. The Company and its outside counsel informed me that the Company fully investigated YOM's vague and conclusory allegations of PPP fraud in his Notice to Report and found them to be without merit.

---

[1] These calls were not recorded. The substance of the calls was relayed to me by the General Counsel, who spoke with YOM during each of the calls.

### C. HSI Opens Investigation and Provides the Company's General Counsel With a Recorder to Record Calls with YOM

14. On or about January 19, 2021, HSI opened an investigation into YOM's extortionate threats against the Company. Shortly thereafter, I provided the Company's General Counsel with a digital recorder and phone wire to record further communications with YOM. I provided the Company's General Counsel with instruction to create a rouse and convince YOM that the Company would accede to his demands and pay him the $500,000.

15. Since providing the Company's General Counsel with the recording device, there have been several consensually recorded and monitored phone calls and text messages, as detailed below, between the Company's General Counsel and YOM, which show that YOM attempted to extort the Company. Despite YOM's professed statement that he had a "duty" to report the Company to the authorities, YOM instead demanded $500,000 in addition to a year's worth of salary as severance in exchange for him to remain silent.[2] During these calls, the General Counsel repeatedly told YOM that the Company did not believe it did anything improper with respect to the PPP loans. He repeatedly asked YOM to substantiate his vague and conclusory allegations, which YOM failed to do.

---

[2] Based on my discussions with the General Counsel, the Company's policy is to ordinarily pay three months of salary as severance to departing employees.

7

**D. YOM's January 19, 2021 Call to General Counsel**

16. On the afternoon of January 19, 2021, YOM called the Company's General Counsel to further discuss YOM's demands for payments. The call was consensually recorded.

17. I have listened to the recording of the January 19, 2021 call. Below is a brief summary of the call:[3]

    a. The call began with the Company's General Counsel informing YOM that there had been an internal discussion regarding the "two options" YOM previously presented: (1) returning the PPP funds or (2) paying $500,000 plus a year of severance to YOM in order to have YOM remain silent. The General Counsel indicated that the company felt both options were without merit as the Company had looked at the loan, believed it was proper, and believed there was no reason to return money to which it was lawfully entitled. YOM stated in reply that the issue would never be discovered—by the Company or anyone else—unless someone (YOM) pointed out the manipulation. The General Counsel asked why the Company should have to pay YOM almost $800,000 when it believed it had done nothing improper. In response, YOM stated that he was being asked to "turn away" from this alleged fraud, which he suggested

---

[3] No transcripts of the three recorded calls exist at this time. Therefore, these summaries and any quotations in this affidavit, which attempt to reflect actual words spoken, are in draft form and are to best of my ability after listening to each call multiple times. Moreover, due to the informal nature of the calls, and YOM and the General Counsel's jumping to various topics throughout the lengthy calls, I have attempted to somewhat organize the calls by topics discussed. As a result, these summaries are not entirely in chronological order of the call.

presented "risks" to him as a licensed accountant. YOM then said that if the Company was trying to negotiate a lower amount, it would "upset" him and YOM would consider increasing his demand.

  b. The General Counsel then asked YOM how the Company's officers would sleep better at night after they paid $500,000 to YOM, intimating what assurances YOM would give, if any, to ensure that he would not go public with his allegations. YOM said that he wanted to ensure that no one knew about this payment of $500,000 as well as he had some "risk."

  c. YOM then hinted at threatening the Company with legal action if it did not accede to his demands. Specifically, YOM said he had spoken to a qui tam attorney regarding a whistle blower lawsuit against the Company. Later in the call, YOM told the General Counsel that the qui tam attorney was "salivating" at the potential to bring this case against the Company. YOM attempted to reassure the Company's General Counsel by claiming that he did not tell the qui tam attorney too much at this time nor did he sign anything yet. YOM continued, however, saying that the qui tam attorney told him that due to the amount of the PPP loan--approximately $5.7 million--the government would likely litigate this qui tam case directly, which would make the case much more expensive for the Company. YOM also raised the potential of the government prosecuting individuals or the company for criminal offenses as well.

  d. The General Counsel responded that the Company was not concerned about a qui tam suit because it believed YOM's

allegations were without merit. But the Company's concern was that it did not want YOM to call the press or law enforcement because then authorities would have to get involved and it would inevitably cause reputational harm to the company. The General Counsel reiterated that the company did not find any merit in his allegations, and that the General Counsel nor any other person could find the evidence of wrongdoing that YOM vaguely asserted had happened at the Company. YOM's response, similar to what I understand he had said previously, was that "only" he could detect the fraud and "only" he could tell the Company or the government how to find it. If YOM did nothing, and he was paid to remain silent as he hinted, no one would ever discover the Company's purported fraud. Later in the call, YOM demonstrated his seriousness to act if the Company did not agree to his demands, at one point stating, in effect, "I will follow through [with it]. . . . so the money must be worthwhile."

   e. The call then transitioned to YOM's desire for payment, including his request for twelve months of severance which he requested be paid via ADP payroll. YOM indicated that he was still looking for a new job and stated that if someone from his next job contacted the Company and hears that YOM was terrible, he would be very upset.

   f. YOM then made a personal request and asked if he could get some computer files back that had nothing to do with the PPP loan from the company. He claimed that this had nothing to do with his demand and that he simply wanted the files for his next job.

10

   g. The General Counsel then stated that the Company's officers had suggested that YOM write a letter retracting his Notice to Report if the Company paid YOM his demand. YOM responded that it was a leap of faith, but he agreed it was sensitive and had to be papered. When asked, YOM replied affirmatively that if the Company paid him (as opposed to returning the PPP funds), YOM would not contact law enforcement or the press. The General Counsel then asked how the Company should put "this" (e.g., the payment to YOM) on the books so that it does not raise a red flag. YOM stated that it would be best to make the severance payments over time. The General Counsel stated it was the extra $500,000 payment, on top of and above the additional severance YOM was demanding, which was the issue and not the twelve months of severance. YOM suggested that the Company could break the $500,000 payment into quarters, for example, and explain it as additional severance.

   h. In closing, the General Counsel intimated that the Company would accede to YOM's demands and requested that YOM "back off" the deadline of January 22 in his Notice to Report. This would allow the Company more time to pull all this together. YOM agreed. YOM then stated that he had to receive a "decent amount of severance" in order to "keep me from doing anything irrational." YOM closed the call by reminding the General Counsel that the qui tam attorneys were eager to act.

 **E.** **YOM's January 21, 2021 Call with the General Counsel**

 18. Following the January 19, 2021 call, the Company's General Counsel continued to keep YOM under the impression that

the Company would pay his demand. The two had a follow-up call on January 21, 2021. The call was consensually recorded.

19. I have listened to the recording of the January 21, 2021 call. Below is a brief summary of the call:

a. YOM stated that he was following up to confirm if they were going for "option two," referring to paying YOM $500,000, as opposed to "option one," which YOM had previously said would require the Company to return its approximately $5.7 million in PPP funds. YOM said he had never done anything like this before, so he could still go with "option one." YOM said if the company went for "option one," he would be "lenient" in terms of severance, implying he would still demand some level of additional severance. YOM then quickly dismissed "option one" as unlikely, saying that the company would probably not want to return the PPP funds. He "doubt[ed]" that the Company would go for that. The General Counsel agreed and said the Company is looking at "option two," and figuring out how to "paper it." The General Counsel went on to state that he was trying to determine how to work the $500,000 payment so YOM will be silent. YOM replied affirmatively that he understood. The General Counsel further stated they would keep YOM on the Company's website for the time being.

b. The General Counsel reiterated that the Company had done nothing improper with its PPP loan. He asked YOM why the Company should return money to which it was legally entitled. YOM said he understood and assured the General Counsel that if they did the "deal," referring to "option two"

12

and the $500,000 payment, that it was in his interest that no one else would file a qui tam suit or find out about this alleged fraud as he claimed that his name was on emails and he had some "risk." The General Counsel again stated the Company did not care about a qui tam suit, as it believed it had done nothing wrong, but instead the Company was more concerned about reputational harm from any statement YOM could make to the press or authorities. YOM agreed and said he got it.

   c. YOM then stated that after he received his payment, he would write a letter retracting his Notice to Report. The General Counsel then suggested that he could give YOM a check for the $500,000 in exchange for YOM's affidavit recanting his allegations. YOM then asked if his twelve months of severance would continue to be paid after he signed a recantation. The General Counsel agreed.

   d. The General Counsel then expressed his anxiety about the situation. He stated that he has never done anything like this and that he was "not happy" to be in the middle of it. The General Counsel then again confirmed that YOM would recant his allegations in return for payment. YOM again agreed but indicated that any recantation would have to come after he received the full $500,000, otherwise the Company could easily stop payments after he signed a recantation. The General Counsel assured him they would not do that as the purpose of the $500,000 payment was to avoid publicity. YOM replied affirmatively. YOM indicated that if the deal goes through, that he would do nothing, stating to the effect of "I'm not

13

going to do anything. Trust me." YOM further indicated his desire to just get this done.

**F. YOM's January 28, 2021 Call with the General Counsel**

20. YOM and the General Counsel had another call on January 28, 2021. The call was consensually recorded.

21. I have listened to the recording of the January 28, 2021 call. Below is a brief summary of the call:

    a. The General Counsel indicated that one of the the Company officers wanted to pay YOM the $500,000 all at once to get this over with. YOM raised the potential of a one-time payment through a cashier's check or a wire. YOM cautioned, however, that any wire should not come from a company account and instead one of the executive's personal accounts so as to not raise any flags. YOM indicated that neither side wanted to leave a trail. He indicated that if it came from an executive's personal account, the executive could say the payment was for any reason, including, for example, a loan to YOM.

    b. The discussion then turned to the recantation affidavit. YOM stated that he could provide his Chase Bank information. YOM said that after he received the $500,000, he would scan and email whatever documents the company prepared. The General Counsel, however, said that the company wanted a simultaneous in-person exchange of any payment and affidavit due to the lack of trust. YOM tried to assuage his concerns, saying "Trust me, if we do this, no one is ever going to hear from me. No one is going to get any information. I am not going to do anything shady like that."

14

    c. YOM then stated that once they figure out the $500,000 payment, they can work on this severance agreement but he wanted to get this payment out of the way by the following Monday.  YOM further indicated that he would highly recommend that the $500,000 payment be kept separate from the severance he was separately negotiating, given the nature of it, and the funds should come from a separate account so there was no audit trail that would raise questions.  The General Counsel then asked if they could wire the money to YOM's bank information in ADP.  YOM said "no," and that he would text his Chase bank information to the General Counsel.

    d. YOM then asked to look at what the Company wanted him to sign in terms of a recantation affidavit, as he understood the company's desire to protect themselves.

    e. YOM concluded the call by again reiterating if the company paid him the $500,000, he would not do anything "shady" so as to not jeopardize the twelve months of severance that he was also negotiating.  YOM said it would be quick and confidential and that he desired to get the $500,000 payment done by Monday.

### G. Further Text Communications Between YOM and the Company's General Counsel

  22. Following the call, YOM and the General Counsel had further communications through text messages.  The General Counsel forward me a text message YOM sent shortly after their January 28, 2021 call, as referenced in their conversation, which provided YOM's Chase bank wiring information.  The screen

15

shot provided by YOM provided his Chase account number ending in 3905, YOM's name as "Ki Yom" and instructions for receiving domestic and international wires.

23. On Sunday, January 31, 2021, the General Counsel emailed YOM a draft recantation affidavit that the Company prepared in return for the $500,000 payment.

### H. YOM's February 1, 2021 Call with the General Counsel

24. On Monday, February 1, 2021, YOM and the General Counsel had another call. The call was consensually recorded. I have listened to the recording of the February 1, 2021 call.

25. During the call, the General Counsel and YOM discussed the affidavit. The General Counsel indicated that the Company would pay the $500,000 that YOM demanded. The General Counsel said, however, that the company preferred a cash payment so as to not leave a trail and to meet in person for the exchange. YOM balked at a cash payment and meeting in person. After some back-and-forth, the General Counsel indicated the Company officers may allow for a cashier's check but the Company still wanted an in-person exchange. He said the Company does not feel comfortable with anything less than an in-person exchange. YOM refused to meet in person. YOM indicated that it was "too risky for me." YOM indicated there were two options: either a wire or an overnight cashier's check. YOM then again reiterated that the Company had "nothing to worry about as long as they say what they are going to do." YOM also mentioned the qui tam attorneys kept calling him. He said they called him again today and "I'm not joking." When the General Counsel again attempted an in-

person meeting, indicating the deal would not go forward without it, YOM refused saying "to be honest with you, I'm not that stupid."

### I. The Phone Number YOM Used to Call the General Counsel Returns to YOM

26. The General Counsel confirmed the cellphone number that YOM called him on during each of the calls, ending in 2212, was YOM's cellphone number.

27. In addition, I reviewed a CLEAR query report for the phone number ending in 2212. The CLEAR report indicated that the phone number ending in 2212 was a Verizon Wireless number linked to YOM at an address on Plaza Del Amo in Torrance, California.

### J. The Company's Interstate Nexus

28. During my investigation, I learned that the Company is involved in interstate commerce in multiple ways through the Company and its parent company ("Parent Company"), including, but not limited to:

    a. Parent Company employs approximately 6 full and part-time employees who reside in the Commonwealth of Massachusetts, including its VP of Engineering;

    b. Parent Company employs one administrative staff member who resides and works in Arizona approximately half of the year;

    c. Out of the approximately 1,000 vendors that Parent Company uses for supplies, equipment, and other services, approximately 250 are based in states other than California;

17

    d. Parent Company utilizes Google services for certain IT functions and it is my understanding that Parent Company data travels to and is stored outside the state of California during routine use of these services;

    e. Parent Company utilizes Amazon Web Services, based in Washington, for data storage and it is my understanding that Parent Company data travels to and is stored outside the state of California during routine use of these services;

    f. Parent Company's principal lender and banker is a subsidiary of Zions Bancorporation, based in Utah;

    g. Parent Company utilizes ADP, a New Jersey-based company, for payroll services;

    h. Parent Company utilizes CareCloud, a Florida-based company, to provide electronic health record services to its managed physician practices; and

    i. Parent Company provides management services to a physician practice that treats patients who reside outside of California.

  29. In addition, YOM emailed his Notice to Report to the Company through his Gmail address. Based on my training and experience and involvement in prior investigations, I know that Gmail's servers are located outside California. Therefore, YOM's email had to travel across state lines to reach the Company. In addition, YOM sent text messages to the Company's General Counsel using a cellphone, an interstate communication device.

## VII. CONCLUSION

30. Based on my training and experience, and the foregoing facts, there is probable cause to believe that YOM has committed a violation of 18 U.S.C. § 1951: Extortion or Attempted Extortion by Nonviolent Threat.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 2nd day of
February, 2021.

*John E. McDermott*

THE HONORABLE JOHN E. MCDERMOTT
UNITED STATES MAGISTRATE JUDGE

19